1

2 **UNITED STATES DISTRICT COURT**

3 **DISTRICT OF NEVADA**

4 * * *

5 Richard Zeitlin, et al.,        Case No. 2:18-cv-01919-RFB-BNW

6          Plaintiffs,

7   v.          **Order re In-Camera Review**

8 Bank of America, N.A.,

9          Defendant.

10

11       Before the Court is an in-camera submission by defendant Bank of America, N.A.

12 ("BANA"). BANA submitted documents that it either redacted or withheld from the plaintiffs on

13 the basis of the Suspicious Activity Report ("SAR") privilege. The district judge directed the

14 undersigned to review the documents to determine whether BANA has properly wielded the

15 privilege. The Court in its discretion finds that BANA has done so.

16    **I.**      **Background**

17       In 1994 Zeitlin opened a personal deposit account with Bank of America, N.A.

18 ("BANA"). ECF No. 1 at 3. Over the next 24 years, Zeitlin opened several more accounts for

19 himself and many of the plaintiff entities. *Id.* Each of these accounts is subject to the terms and

20 conditions of BANA's deposit agreement. *Id.* The agreement allows BANA to "freeze some or all

21 of the funds," in its discretion, if BANA "believe[s]" the accounts "may be subject to irregular,

22 unauthorized, fraudulent, or illegal activity." *Id.* at 4.

23       In August 2018 BANA froze several of Zeitlin's personal and business accounts. *Id.*

24 Zeitlin demanded from BANA an explanation about why the accounts were frozen, and in its

25 response BANA relied on the above-quoted freeze clause. *Id.*

26       Zeitlin and the other entity plaintiffs filed a complaint against BANA in October 2018. *Id.*

27 at 1. Zeitlin alleged that, due to the freezes, he had lost at least $2 million in sales, was forced to

28 lay off employees, and suffered $150,000 in damages due to lost daily production. *Id.* at 6.

1  Plaintiffs' surviving claims include breach of contract and breach of the implied covenant of good

2  faith and fair dealing. *Id.* 6–8; ECF No. 27.

3         For its part, BANA asserts that it froze the accounts because it identified transactions that

4  it believed were "irregular, unauthorized, fraudulent or illegal." ECF No. 114 at 2.  Specifically,

5  BANA identified the deposit of millions of dollars into plaintiffs' accounts, all from different

6  purported charities. *Id.*  Following these deposits, Zeitlin supposedly wired millions of dollars out

7  of the country to Panama, Guatemala, and the Philippines. *Id.*  BANA grew concerned that

8  Zeitlin's accounts were being used in a largescale fraud scheme. *Id.*  BANA's concerns were

9  buttressed by public records research into Zeitlin, which revealed that Zeitlin and some of the

10  other plaintiffs were being investigated for fraud and other illegal practices in the charity sphere.

11  *Id.*  With this in mind, BANA froze plaintiffs' accounts pursuant to the terms of the deposit

12  agreement(s). *Id.*  BANA eventually closed plaintiffs' accounts and returned his balances. *Id.*

13         The parties are in the midst of discovery.  This past May, plaintiffs filed a 79-page motion

14  to compel discovery in which they argued that BANA wrongfully withheld documents based on

15  an impermissibly broad interpretation of the SAR privilege. ECF No. 104 at 9.  Before the

16  deadline for BANA's response, the district judge denied plaintiffs' motion because of its length.

17  However, the district judge ordered BANA to submit in-camera those documents that it either

18  withheld or redacted on the basis of the SAR privilege and a sample of documents that it

19  produced because the documents fell outside the scope of the SAR privilege. ECF No. 111.

20  **II.    Legal standards**

21      **a.  Discovery**

22         Discovery is broad. *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528 (D. Nev.

23  1997).  Parties may obtain discovery on any nonprivileged matter relevant to any party's claim or

24  defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).  The Court "must"

25  limit discovery if it determines that the discovery sought "is unreasonably cumulative or

26  duplicative, or can be obtained from some other source that is more convenient, less burdensome,

27  or less expensive." Fed. R. Civ. P. 26(b)(2)(C).  The same applies when the party seeking

28

discovery has had ample opportunity to obtain the information by discovery in the action or when the proposed discovery is outside the scope of Rule 26(b)(1). *Id.*

The court has broad discretion to permit or deny discovery, and its decision will not be disturbed "except upon the clearest showing" that the denial "results in actual and substantial prejudice to the complaining litigant." *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).

### b. The Bank Secrecy Act and Suspicious Activity Reports

Under the Bank Secrecy Act ("BSA"), the Secretary of the Treasury "may require any financial institution . . . to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

The Financial Crimes Enforcement Network ("FinCEN") and Office of the Comptroller of the Currency ("OCC") have each issued relevant regulations. FinCEN requires a SAR when a transaction involves at least $5,000 and "the bank knows, suspects, or has reason to suspect that . . . [t]he transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities." 31 C.F.R. § 1020.320(a)(2)(i). Similarly, the OCC requires a bank to file a SAR when it "detect[s] a known or suspected violation of Federal law or a suspicious transaction related to a money laundering activity or a violation of the [BSA]." 12 C.F.R. § 21.11(a). Banks file their SARs with FinCEN. 31 C.F.R. § 1020.320(b)(2); 12 C.F.R. § 21.11(c).

If a bank makes a SAR, then it and its employees are prohibited from "notify[ing] any person involved in the transaction that the transaction has been reported." 31 U.S.C. § 5318(g)(2)(A)(i). The implementing regulations by the FinCEN and OCC each similarly prohibit a bank from disclosing a SAR, but also any information that "would" reveal the existence of a SAR. 31 C.F.R. § 1020.320(e)(1)(i);12 C.F.R. § 21.11(k)(1)(i). Both the FinCEN and OCC have issued interpretive guidance stating that the disclosure prohibitions extend to no-SAR decisions as well. 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010) ("an institution also should afford confidentiality to any document stating that a SAR has *not* been filed.") (emphasis added); 75 Fed. Reg. 75576, 75579 (Dec. 3, 2010) ("By extension, a national bank also must afford confidentiality to any document stating that a SAR has not been filed."). The logic driving both of these interpretations

is that if a bank were able to disclose "information when a SAR is not filed, institutions would implicitly reveal the existence of a SAR any time they were unable to produce records because a SAR was filed." 75 Fed. Reg. 75593, 75595 (Dec. 3, 2010); *accord* 75 Reg. 75576, 75579.

Stated plainly, then, "the key query is whether any . . . documents suggest, directly or indirectly, that a SAR was or was not filed." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 43 (1st Cir. 2015). When the OCC promulgated its final regulations, it emphasized that "the strong public policy that underlies the SAR system as a whole . . . leans heavily in favor of applying SAR confidentiality not only to a SAR itself, but also in appropriate circumstances to material prepared by the national bank as part of its process to detect and report suspicious activity, regardless of whether a SAR ultimately was filed or not." 75 Fed. Reg. 75576-01, 75579 (Dec. 3, 2010). To that end, some courts have held that "documents which have been prepared as part of a national bank's process for complying with federal reporting requirements are covered by the SAR privilege." *Lan Li v. Walsh*, 2020 WL 5887443, at *2 (S.D. Fla. Oct. 5, 2020).

There are limitations to the scope of the SAR. The regulations provide that the disclosure prohibition does *not* extend to "[t]he underlying facts, transactions, and documents upon which a SAR is based." *See, e.g.*, 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2); *accord Cotton v. Private Bank and Trust Co.*, 235 F. Supp. 2d 809, 815 (N.D. Ill. 2002) ("documents which give rise to suspicious conduct . . . are to be produced in the ordinary course of discovery because they are business records made in the ordinary course of business"). Plus, the use of the term "would" in the regulations has been construed to mean that "review of the document must" reveal "with effective certainty the existence of a SAR." *First Am. Title Ins. Co. v. Westbury Bank*, 2014 WL 4267450, at *2 (E.D. Wis. Aug. 29, 2014). "[I]nformation that, with aid of supposition or speculation, might tend to suggest to a knowledgeable reviewer whether a SAR was filed, is not privileged." *Id.*

To the extent the SAR privilege applies, it "is unqualified and cannot be waived." *Id.*

## III.    In-camera documents

### A.  Withheld documents

BANA submitted 12 documents that it withheld on the basis of the SAR privilege.  After considering the relevant standards, the Court finds that all of these documents were properly withheld on the basis of the SAR privilege.

Included among these documents were screenprints of BANA's case-management system, which BANA says it uses to track its investigation cases and determinations as to whether to file a SAR.  It is unclear whether BANA uses this case management system to monitor suspicious activity generally or whether it is used solely in the context of the SAR/no-SAR decision-making process.  If it is the latter, then the *Lan Li* decision would require its withholding on the basis of the SAR privilege because it is a document prepared as part of BANA's federal reporting requirements.  If it is the former, then the *First Am. Title* decision would mandate its production with appropriate redactions because "detecting fraud is part of a bank's ordinary course of business." *First Am. Title*, 2014 WL 4267450, at *3.  "This is true even if this fraud investigation parallels the process of preparing a SAR." *Id.*

However, even if *First Am. Title* applied, the documents still fall within the SAR privilege.  It does not appear that the documents constitute "[t]he underlying facts, transactions, and documents upon which a SAR is based." *See* 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2).  Rather, the documents largely contain either a SAR or no-SAR narrative.  A SAR narrative is a free-text area included in a SAR form to summarize suspicious activity about a "suspect" or "suspects."[1] Thus, SAR narratives clearly fall within the scope of the SAR privilege because they are "material of an evaluative nature" prepared "for the specific purpose of complying with federal reporting requirements." *See Lan Li*, 2020 WL 5887443, at *2.  It follows, then, that a no-SAR narrative is likewise within the privilege because it would reveal that a bank did *not* file a SAR.

---

[1] FINANCIAL CRIMES ENFORCEMENT NETWORK, *Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative*, https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf (last accessed June 23, 2021).

Further, the Court in its discretion finds that the remaining information on the screenprint documents "would" reveal whether a SAR was filed. Thus, the Court will not order their production.

The remaining documents were likewise properly withheld on the basis of the SAR privilege. These documents include SAR or no-SAR narratives, emails by and between BANA employees, and a few Microsoft Excel spreadsheets. The Court is mindful that—as plaintiffs argued in their now-denied motion to compel (ECF No. 104)—BANA cannot find refuge in the SAR privilege by merely tying information or documents to its SAR/no-SAR decisionmaking process. But the Court in its discretion finds that the withheld documents "would" reveal whether a SAR was filed without the aid of supposition or speculation.

**B. Redacted documents**

BANA submitted 17 redacted documents for in-camera review. For the vast majority of the documents, the redactions are limited to very little information. The substantial redactions on the remaining documents were made to protect the confidentiality of SAR or no-SAR narratives. The Court finds that both the limited and substantial redactions are within the scope of the SAR privilege.

**IV. Conclusion**

Having reviewed defendant's in-camera submission and considered the relevant legal standards, the Court finds that defendant has properly withheld or redacted the documents contained in the in-camera submission on the basis of the SAR privilege.

DATED: June 24, 2021.

_____
Brenda Weksler
United States Magistrate Judge